UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

NICOLE CONSTABLE,           )
                            )
        Plaintiff,          )
                            )
    vs.                     )        Case No. 4:14 CV 1128 CDP
                            )
CAROLYN W. COLVIN,          )
Acting Commissioner of Social Security, )
                            )
        Defendant.          )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for

judicial review of the Commissioner's final decision denying Nicole Constable's

application for supplemental security income (SSI) under Title XVI of the Social

Security Act. 42 U.S.C. §§ 1381 *et seq.* Constable claims she is disabled due to a

combination of impairments including bipolar disorder, social anxiety, depression,

seizures and back problems, and mental instability. After a hearing, the

Administrative Law Judge concluded that Constable is not disabled. Because I

find that the ALJ did not properly evaluate the weight to accord the opinions of

Constable's treating physician, I will reverse and remand for further proceedings.

## I.    Procedural History

Constable filed her application on May 27, 2011. She alleged a disability

onset date of January 1, 2007. When her application was denied, she requested a

hearing before an administrative law judge.  She then appeared at an administrative hearing on December 19, 2012, where she was represented by counsel. Constable and a vocational expert testified at the hearing.

After the hearing, the ALJ denied Constable's application in a decision dated February 11, 2013, and Constable appealed to the Appeals Council.  On April 22, 2014, the Council denied her request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Constable now appeals to this court.  She argues that: (1) the ALJ's RFC was improper because it was not based on some medical evidence; and (2) the ALJ erred in her credibility determination.  Constable claims these mistakes led to a decision by the ALJ that was not supported by substantial evidence in the record and should be reversed or remanded for further evaluation.

## II.    Evidence before the Administrative Law Judge

### *Function Reports*

In support of her application, Constable completed a function report in August 2011.  She wrote that her daily activities consist of waking up around 10 or 11, watching television, and waiting for her mom to get home.  She wrote that she rarely feels like bathing or getting dressed, and she generally eats only once a day.

She wrote that she wants to leave the house but has anxiety and does not want to see or talk to anyone.  If they go to town, she waits in the car.

Constable wrote that prior to the onset of her illnesses she was able to work and had better self-esteem and confidence.  She reported that her sleep is affected by her illnesses, and she has anxiety and pain from her back and/or leg that keep her from sleeping.   Constable reported that she does not do her hair or make-up, bathes only two or three times per week (sometimes her mother needs to remind her to bathe), shaves her legs once a week and prepares and feeds herself frozen dinner or "something easy" in the late afternoon.  She does not need reminders to take medicine, and she prepares her own meals, including frozen dinners, sandwiches, hot pockets, and yogurt.

Constable wrote that for household chores, she is able to pick-up, take out the trash, make her bed, do laundry, sweep, and if her back is not hurting, vacuum.  She reported that her family has to remind her to do these things or sometimes threaten to kick her out of the home if she does not do them.

One to three times a week Constable reported that she goes outside.  She rides in a car or uses public transportation, but usually goes with someone because she does not "want something bad to happen" and does not "want to mingle in public."  She reported that she does not drive due to a DUI from 2006.  Constable noted that she rarely shops, but she shops in stores and on the computer.  She shops

for 30 minutes at the most. Constable checked boxes indicating she is able to pay bills, count change, handle a savings account and use a checkbook.

Constable reported that she has "lost" her hobbies and her interest in a lot of life since the onset of her illnesses. Socially, she tries to go to church every Sunday or when her "mood is right," but she reported that she needs to be accompanied by her mom or dad. She wrote that she argues with her family often because she does not pay bills or do enough chores, and she does not attend family functions like she used to because she is embarrassed.

Constable indicated that her illnesses affects her ability to lift, squat, bend, kneel, talk, climb stairs, remember, complete tasks, concentrate, follow instructions, and get along with others. She reported that she can pay attention for approximately 20 minutes, does not finish what she starts, and can follow spoken instructions "pretty well." Constable wrote that she gets along with authority figures "somewhat well." She has never been fired or laid off for problems getting along with other people. Constable wrote that she does not handle stress well, and she has public/social anxiety and fears meeting new people and going places alone.

Michelle Constable, the claimant's mother, also completed a function report for claimant in August 2011. M. Constable reported that she spends 3-4 hours a week with her daughter during which they watch television, eat, and talk. She indicated that her daughter lives in a mobile home with family but lays in bed in

her pajamas most of the day and bathes maybe two times per week.  M. Constable wrote that claimant feeds, waters, and plays with a kitten.  She reported that prior to her daughter's impairments, her daughter was able to work and attend school.  Now, claimant experiences erratic sleep, dresses sloppily, does not bathe regularly, does not fix her hair very often, and does not eat regularly.  M. Constable has to remind claimant to bathe and to take her antidepressants.  She reported that claimant sometimes prepares herself frozen dinners but does not participate in household chores.  Claimant mostly just sleeps and is despondent despite her mother's encouragement to participate in things.  M. Constable reported that claimant goes outside 2-3 times per week, and that she can go out alone but cannot drive herself.  Claimant shops in the grocery store once every week or two and can count change, but is not able to pay bills, handle a savings account, or use a checkbook.

According to M. Constable's report, since the onset of her impairments, claimant has lost interest in working, working out and attending school.  Her hobbies now include watching television and playing with her cat.  Socially, she telephones and texts her family and a few friends but does not go anywhere on a regular basis, and she has trouble keeping relationships.  M. Constable reported that claimant needs to be reminded to go places, like her doctor appointments, and since the onset of claimant's illnesses, she generally shows no interest in

socializing with others. Claimant's impairments affect her ability to lift, climb stairs, squat, kneel, bend, talk, complete tasks, get along with others, remember, and concentrate. Claimant does not like authority, does not handle stress or changes in routine very well, and is scared of being alone in public.

M. Constable wrote that claimant is very despondent, fights with her friends, and has a hard time keeping friends and getting along with family. She noted that claimant is very immature at times.

*Medical Records*

Mental Health History

**Dr. Donald James**

Constable saw Dr. Donald James four times between May 2010 and February 2011. Visit notes from May 2010, show James believed Constable suffered from chronic anxiety, chronic depression and neck pain secondary to a motor vehicle accident. On January 14, 2011, Constable complained of seizure and panic attacks. James' impressions from that visit were recorded as "[s]eizure versus pseudoseizure versus borderline personality disorder versus depression versus panic attacks." He noted that he discussed her drug use with her, she wanted to enter a teen treatment center, and she had a consult set up with a neurologist. On January 27, 2011, James' notes indicate Constable suffered from chronic anxiety, a questionable seizure disorder, and cannabis usage, though

Constable reported she was no longer using.  In February 2011, she was seen by James for complaints of anxiety and two seizures.  He noted she had polysubstance and alcohol abuse problems.  [Tr. 281-290].

**St. John's Mercy Medical Center**

In December 2010, Constable was admitted to St. Johns Mercy Medical Center for a complaint of possible seizures.  She was diagnosed as having had a panic attack and discharged the same day.  She was prescribed Lorazepam.  The notes state Constable was negative for depression. [Tr. 260-279]

**Dr. Daniel C. Vinson**

The record contains a significant number of clinic notes, dating from May 2010 through December 2012, made by Dr. Daniel C. Vinson, who served as Constable's primary care physician for at least two and a half years leading up to her administrative hearing.   Vinson's notes consistently list Constable's problems as agoraphobia; anal fissure; benzodiazepine abuse, continuous; chronic recurrent major depressive disorder; opioid dependence, in remission; and panic disorder. However, Vinson's "diagnosis" of Constable at each visit typically only included a few of these problems. More specific notes from these visits were as follows:

In May 2010 it was noted that Constable had not kept recent follow-up appointments and had decided to stop her Suboxone.  Off of it, she had craved and taken some illicit opioids.  Her depression was much worse, and at the appointment

she was depressed, tearful and anxious.  In June 2010, Constable was back on her Suboxone.  She reported being more anxious recently.  She was going to narcotics anonymous each week and had been in counseling at "Pathways."  Vinson noted that her opioid dependence was doing well but her psych problems were not.  He noted she had missed her appointment with a psychiatrist that morning and had been very unwilling to see psychiatrists in their clinics in the past.

Constable missed scheduled appointments with Vinson in July and August 2010.  In September 2010, she reported she had relapsed after being given a prescription for Percocet after surgery. She had been out of Suboxone for three weeks and reported using illicit benzos.  At her October 2010 appointment Constable reported severe depression and anxiety, but she reported no recent illicit drug use and was attending alcohol education classes.

Constable missed her appointment in November 2010.  In December 2010, she failed to show up for her appointment but called in two hours later pleading for a refill on her Suboxone.  At her January 2011 appointment, Constable reported doing "all right."  She had recently had a panic attack and a pseudoseizure that was ascribed to her panic disorder.  Vinson noted that her opioid dependence seemed to be doing well.  Constable's pharmacy reported that she had received multiple benzodiazepine prescriptions in the recent months and had reported a theft of one and received a new prescription for it.  Vinson noted this was strong evidence of

aberrant drug-related behaviors and he suspected benzo dependence or abuse. Constable's affect was noted to be depressed. In February 2011, Vinson noted that Constable's anxiety symptoms were severe, and her anxiety, panic disorder, and agoraphobia were hard to manage. Her affect was anxious. In April 2011, Constable reported being very depressed. She wanted to see a psychiatrist but had difficulty getting an appointment because she had failed to keep so many previous appointments. Her affect was depressed. In May 2011, Constable again indicated she needed help from psychiatry, but she had not shown up for her April appointment. Vinson noted she was anxious, tearful, and "bargaining, pleading" for Xanax. [Tr. 292-342]. Visit notes from July reported the same issues from previous visits. [Tr. 346-356].

Throughout the period of August 2011-September 2012, Vinson prescribed Constable Suboxone (for pain and opioid addiction), Klonopin for anxiety, and Wellbutrin, Celexa and/or Zoloft for depression. During her pregnancy, which appears to have been first discovered by Vinson in November 2011, Vinson switched her from Suboxone to Subutex. As of April 2012, Vinson stopped prescribing Constable Klonopin, noting that she had a benzodiazepine addiction and should not be on any of the benzo family of medications. It appears that at this time he also stopped her antidepressant medications. Vinson's July 2012 visit

notes report that another doctor was prescribing Constable Zoloft for depression. More specific notes made by Vinson from this period are as follows:

In August 2011 Constable reported her depression was better, her anxiety was "always present" but Klonopin took the edge off, and she had some pain, which she said was helped by Suboxone. In September 2011 Vinson reported Constable had continued anxiety and panic attacks but had not pushed for an increase in her benzo despite this. At her October 2011 visit, Vinson noted Constable was slightly depressed with a flat affect but still smiled several times. He felt she was reasonably stable and her anxiety appeared well controlled on Klonopin.

Vinson's notes from Constable's November 2011 visit report that anxiety was still a major problem for her. She had cocaine in her urine and was noted to be 26 weeks pregnant. She was working with a caseworker to find her own place, but for the time being was sleeping on her father or her aunt's couch. At Constable's December 2011 visit, Vinson noted that she was staying in a "safer place" at her mother's home. She reported that at her father's house, her father's girlfriend had been taking her Suboxone. Vinson continued to encourage Constable to work with a psychotherapist. In January 2012, Vinson noted that Constable was "doing well" and attending group therapy. She was finally living in her own place.

Vinson's notes from late February 2012 state that Constable had a C-section to deliver her daughter on February 13, and her daughter remained in the NICU because of opioid withdrawal. Vinson noted that the drugs that the infant tested positive for indicated that Constable's drug use during pregnancy was "almost certainly substantially greater than she acknowledges here today or in recent phone conversations…." He reported that Constable's "use of benzos is out of control." Constable acknowledged using Percocet and some Xanax during pregnancy but said it was only when she ran out of her prescriptions. Vinson noted that Constable was angry about Department of Family Services' involvement with her and her daughter – she was tearful and defensive. He noted that nurses from the hospital where she delivered had reported that she displayed concerning behavior, but she attributed that behavior to anxiety and stress. [Tr. 430].

In notes from Constable's April 2012 visit, Vinson reported that she was defensive about her recent problems, blaming various other people for her troubles. He noted that when he told her she had an addiction to benzodiazepines, she began reciting all of her anxiety problems to him, saying that even her baby "has to have Klonopin to function normally." [Tr. 426]. At this visit, the records indicate Vinson did not refill or renew Constable's Klonopin prescription.

Vinson's May and July 2012 notes indicate that Constable was doing somewhat better. During her July appointment, she stated that she was starting to

get comfortable in counseling and that she felt healthy and clear-headed, but that all of her life was still a struggle. At her July 2012 visit, Constable had her daughter with her, Vinson reported Constable was attentive and caring, and held the baby throughout the appointment.

Vinson's September 2012 notes indicate Constable reported she had anxiety she did not know how to deal with, but she was feeling less depressed. Vinson indicated Constable was still having marked anxiety. His notes show that at this visit he prescribed her Zoloft for depression and sertraline for anxiety. He noted that if she had no improvement in her anxiety in four weeks, he planned to switch her to fluoxetine. [Tr. 413-456]

At Constable's October 2012 visit with Vinson, she reported that she had not seen her therapist for three weeks. She had called for an appointment two days previously but had not been called back yet. She had been seeing a counselor at Southeast Missouri Behavioral Health but that work had concluded, and she reported that in any case neither her therapist nor her counselor had focused on her anxiety. She reported that her anxiety persisted, she was "doing OK" taking care of her daughter, but her only support was her grandparents, who did not seem to understand medication assisted treatment of addiction. Vinson's notes state that Constable was "doing well except for anxiety." His office would contact Pathways Community Behavioral Healthcare to see if they had a therapist who could address

Constable's anxiety. He noted more needed to be done to control her anxiety or she risked a relapse to illicit benzo use. [Tr. 601-604].

Vinson's notes from December 2012 state that she came with her grandmother and daughter. Her biggest problem was anxiety, and she asked about a psychiatry consult during the visit. He reported that she had tried at least seven anxiety medications but only Klonopin helped, and she wanted to take it again. He wrote that her anxiety was worse in public, even in a grocery store. It had prevented her from enrolling in school to get her GED. He noted that she was no longer with Pathways because she had lost her insurance for a short period and her spot was not available. She had not been able to get a psychiatry appointment on her own because she was still taking Suboxone. At the appointment Constable was "anxious, almost tearful talking about her anxiety." She stated "I really need help … I've let this go too long." Vinson increased and/or supplemented some of Constable's anxiety medication and consulted a psychiatrist about same. He also connected her with a social worker he thought could help with finding her a psychotherapist near her home. [Tr. 588-593].

**Pathways Community Behavioral Healthcare**

The record contains office treatment records from Pathways Community Behavioral Healthcare, Inc. dated April 2012 to September 2012. Constable received home visits from Pathways social workers who completed progress notes

on her status.  She also was seen by a Pathways psychiatrist, Dr. Denise Troy Curry during this time.

The social workers' notes indicate Constable reported being deeply depressed during their first two visits, finding it difficult to get out of bed and eat, and only feeling happy when she was with her baby, who was still in the hospital. She was prescribed and started taking Remeron for depression but was resistant to the idea of entering drug treatment while her daughter was still in the hospital.  At the representatives' third visit on April 30, Constable was happy, smiling, and feeling optimistic.  She reported that she had spoken with a treatment center that said she could be admitted very soon.  She had stopped taking Remeron because it made her groggy.

At her May 3 visit with Curry, Constable reported her mood was improving and the past week's events had been good.  Curry noted Constable's affect was less blunted and anxious.  Curry reported her impressions as:

| | |
|---|---|
| Axis I: | Panic Disorder, with agoraphobia |
| | Opioid Dependence |
| Axis II: | Diagnosis deferred |
| Axis III: | 7 weeks postpartum |
| Axis IV: | severe: limited supports, chronic illness, baby with DFS |
| Axis V: | GAF 52 |

On May 8, Constable reported feeling down again and like she did not want to get out of bed or get dressed, however, she entered treatment at the Carol Jones Treatment Center in May as planned.  She was there until mid-June 2012.

Constable met with the Pathways social workers again starting in late June 2012. She reported that she was on Chlordiazepoxide for anxiety but it did not make her feel better. She reported feelings of anxiety and depression. Constable missed or cancelled appointments with Pathways on June 21 and 22. She met with Dr. Curry on June 28 and reported that she was doing well in some things but might be more depressed. Curry noted that Constable appeared lethargic and fatigued with a blunted facial expression. Her affect was blunted and anxious. Curry noted that Constable's anxiety was unremitting and she was having panic causing loss of consciousness. Curry reported her impressions as:

| | |
|---|---|
| Axis I: | Depression |
| | Panic disorder with agoraphobia |
| | Opioid dependence |
| | Consider bipolar II |
| Axis II: | Deferred at this time |
| Axis III: | 7 weeks postpartum |
| Axis VI: | severe: limited supports, chronic illness, baby with DFS |
| Axis V: | GAF 52 |

The same day, Constable met with her social workers and reported having depression and an overwhelming feeling of anxiousness. She reported being unhappy with Curry and asked the social workers to help her find a new psychiatrist and primary care provider.

Constable met with a new Pathways psychiatrist, Dr. Suneetha Somireddy, on July 9, 2012. Constable reported feeling very depressed and anxious. Somireddy reported her impressions as follows:

| Axis I: | Depression, NOS; r/o major depressive disorder-recurrent |
|---|---|
| | Panic disorder, with agoraphobia |
| | Generalized anxiety disorder |
| | Opioid dependence |
| | Consider Bipolar II |
| Axis II: | Deferred at this time |
| Axis III: | Postpartum, obesity |
| Axis IV: | severe: limited supports, chronic illness, baby with DFS |
| Axis V: | GAF 50 |

At a visit with her Pathways social workers on the same day, Constable reported feelings of anxiety, depression, panic, and agoraphobia. She said her family had little faith in her and she found herself avoiding them. She had little motivation to get out of bed and shower and stated that nothing made her happy. She agreed to attend one or two Birthright classes per month once her daughter came home with her.

At visits in mid and late July with her Pathways social workers, Constable reported she was doing well and trying to follow the instructions of the court. She reported a decrease in depression but stated that she was feeling slightly overwhelmed but was managing it well. Her biggest worry was about not hearing her daughter cry when she woke up at night, as her daughter was scheduled to come home for 30-day trial August. At a meeting in September with a licensed professional counselor from Pathways, Constable apologized for missing several previous appointments. Constable identified her mood as good.

At her final visit with Dr. Somireddy, Constable reported her depression was a little better but that she was still struggling with anxiety, particularly social anxiety, and she had been missing her parenting classes and appointments because of it. Somireddy's impressions were the same as those noted after the previous visit. [Tr. 357-412]

**Salem Hospital**

Constable was admitted to the emergency department at Salem Hospital in February 2012 after being sent there by the treatment center she was in. She complained of being very anxious, stressed, and depressed. She reported that she was not eating and did not care what happened to her. Constable complained that she had done everything she had been told to do to get her baby back. The ED doctor who saw her diagnosed her with adjustment disorder with anxiety. He advised her of some coping mechanisms and discharged her. [Tr. 486-89].

Constable was admitted to the Salem Hospital emergency department in March 2012 for a reported seizure brought on by stress. She was given magnesium sulfate and decadron and discharged after two hours. [Tr. 469-473].

**Carol Jones Recovery Center**

Constable was admitted into a residential treatment program (Carol Jones) from May 14, 2012 to June 18, 2012. Notes made upon her admission indicated she reported having participated in approximately seven substance abuse programs

in the past, successfully completing about three of them and dropping out of many of them. She admitted to approximately four years of substance abuse. Constable first reported that she was close with her mother, father, sister, and grandmother but later admitted that she and her parents were not that close and that her grandmother was her primary support person. She reported having two to three close friends who do not abuse substances. Constable's primary concern was the custody situation with her daughter. She stated she was not seeking employment until her daughter was at least six months old. The notes state that Constable presented with mild depression and reported ongoing feelings of anxiety and panic attacks. She reported experiencing such severe panic attacks in the past that she blacked out and had seizures. She denied any reoccurring or current medical complications. Constable admitted that in the last month and a half of her pregnancy she had relapsed on Xanax, Percocet, and hydrocodone. She also admitted taking at least one Xanax as recently as that month (May 2012). She claimed her anxiety was ridiculous and she was often panicky.

Upon admission, Constable was seen by Lisa See, MSW, LCSW, CADC. See noted that she had concerns about Constable "not factually reporting some of the information that resulted in her referral" to the program. See noted that this "also provided a challenge in the diagnostic process." See's impressions were:

Axis I:    Opioid dependence
           Sedative, hypnotic, or anxiolytic abuse (R/O dependence)

```
                    Anxiety disorder NOS
                    Depressive disorder NOS
    Axis II:        Diagnosis deferred
    Axis III:       Observe other mental conditions
    Axis VI:        Legal problems, problems with primary support group
    Axis V:         GAF: 50
```

The discharge summary from Constable's stay indicates that at the end of her treatment, she elected not to continue her benzodiazepines because of her previous abuse of them. Her psychological problems were listed as anxiety, panic attacks, and depression. [Tr. 572-587].

### Southeast Missouri Behavioral Health

From December 2011 to June 2012, Constable was admitted to the SMBH outpatient program. The discharge notes from this period state that Constable had worked with the licensed professional counselor on her mental health goals and completed the objectives of her treatment plan. They state that she had a supportive family and a referral for local support groups and that she "portrayed a positive and upbeat attitude toward the treatment of her sobriety." Gabriel Chambers, BA, RASAC I, CSS and William B. Matthews, MS, LPC, CRC assessed Constable as follows:

```
    Axis I:         Major depressive disorder recurrent – moderate
                    Cannabis abuse
                    Opioid Abuse - Percocet
    Axis II:        Social anxiety disorder
    Axis III:       risk mild
    Axis VI:        housing problems
                    legal problems
```

               social problems
               occupational problems

Axis V:       GAF: 60

From July to October 2012 Constable was again admitted to SMBH's program after being referred by the Carol Jones center and the Department of Social Services for treatment of chemical dependence and mental health issues. SMBH's discharge summary from this period states that Constable completed all the requirements of her program, and developed a treatment plan with objectives in chemical dependence and mental health. It further states that Constable was attending NA meetings on Tuesdays and Saturdays and that she "represented that she has strong family support." Carolyn Baty, LPC completed Constable's discharge summary and her assessment of Constable was as follows:

Axis I:        Opioid dependence
                  Cannabis dependence
                  Major depressive disorder recurrent – moderate
                  Social anxiety disorder
Axis II:      No diagnosis
Axis III:     Risk: Moderate
Axis IV:     DSS involvement
Axis V:      GAF: 76

<u>Degenerative Disc Disease and Obesity</u>

Dr. James noted in May 2010 that Constable's spine was normal and she had a normal range of motion and function. [Tr. 282]. In her June 2010 appointment with Dr. Vinson, Constable reported she was having pain from her right lower back down her right leg. [Tr. 328]

Constable was admitted to the Salem Memorial emergency department in December 2010 complaining of back pain that was precipitated by a fall she had had four to five days previously. She reported extreme pain in her low back with pain radiating to her legs. She was seen by Dr. David White whose notes state Constable had decreased range of motion with extension, though she had normal spinal alignment. Her motor and sensation were normal; her gait was steady but slow. The nurse's notes from this visit indicate Constable was impatient and anxious. An x-ray was taken of her lumbar spine, and the radiologists found "degenerative changes [were] present at L4/L5 and facet joints at lumbosacral junction" but "no other significant changes" were seen. Constable eventually checked herself out of the hospital against medical advice approximately four hours after admission. [Tr. 511-520].

At three separate visits to Dr. James in January and February 2011, it was noted that Constable's spine was normal and her extremities had a normal range of motion and function. [Tr. 283-287]. In February 2012, at a visit to the Emergency Department at Salem Hospital for mental health-related reasons, Constable reported she had pain in her coccyx radiating to her right leg. She rated the pain in her coccyx a six out of ten. [Tr. 486]

## *Residual Functional Capacity Assessment*

In August 2011, as part of the administration's initial disability determination, state agency psychologist Dr. Steven Akeson reviewed Constable's medical records and completed a residual functional capacity assessment. In the area of understanding and memory, Dr. Akeson opined that Constable's ability to remember locations, work-like procedures, and short and simple instructions was not significantly limited. He opined that her ability to understand and remember detailed instructions was moderately limited.

In the area of concentration and persistence, Dr. Akeson opined that Constable's ability to carry our very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods was not significantly limited. He opined that her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them was moderately limited.

As for Constable's social interaction limitations, Akeson opined that her ability to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness was not significantly limited. He opined that her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited. [Tr. 79-81].

### Medical Source Statements

On December 11, 2012, Dr. Vinson completed an Alcoholism and Drug Addiction Evaluation in which he reported that drug addiction is not Constable's only impairment, and although her other impairments are exacerbated by drug use, without drug use, they would still be disabling. In the comments section, Vinson noted that Constable is stable in recovery from opioid use disorder.

On the same date, Vinson also completed a Medical Source Statement – Mental and a Medical Source Statement – Physical. Both medical source statements consisted primarily of check boxes.

In the mental MSS Vinson reported that Constable's ability to remember locations and work-like procedures and to understand and remember very short and simple instructions was not significantly limited. He reported that her ability to understand and remember detailed instructions was moderately limited. He

reported that her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary routine without special supervision was not significantly limited. He noted that Constable's ability to understand and remember and carry out detailed instructions, maintain attention and concentration for extended periods, and make simple work-related decisions was moderately limited. He noted that her ability to work in coordination with or proximity to others without being distracted, to complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods was markedly limited. With regard to social interaction, he reported that Constable's ability to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness was not significantly limited. He reported that her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes was markedly limited. Vinson reported that Constable's ability to respond appropriately to changes in the work setting, be aware of normal hazards, and take appropriate precautions was moderately limited. Her ability to set realistic goals or make plans independently of others was

markedly limited, and her ability to travel in unfamiliar places or use public transportation was extremely limited.

In the physical MSS completed by Vinson, he reported that Constable could frequently lift or carry 10 pounds, occasionally carry 20 pounds, stand or walk continuously for 30 minutes and for three hours in an eight-hour day, sit continuously for 30 minutes and for four hours in an eight-hour day, and push or pull an unlimited amount. He opined that she could never climb, stoop, kneel, crouch, or crawl, but that she could frequently balance, reach, handle, finger, feel, see, speak, and hear. He reported that she should avoid any exposure to extreme cold or heat, dust or fumes, hazards, and heights. She should avoid moderate exposure to weather, wetness/humidity, and vibration. Finally, he wrote that Constable would need to lie down or recline every three hours for ten minutes during an eight-hour work day.

<em>Constable's Testimony Before ALJ</em>

At the administrative hearing before the ALJ on December 19, 2012, Constable testified that she had recently moved in with her grandparents while she looked for another home to live in with her daughter. She testified that since her alleged onset date she went into debt on credit cards and received some help from her family to support herself.

Constable stated that she has an email address and a Facebook page, but she does not check Facebook much because it gives her anxiety. When asked why she thinks she is disabled, Constable responded that she struggles with anxiety and depression, and she always makes things a "bigger deal" in her head than they actually are. She testified that she could be doing fine at a job or school, but then one day she won't feel good enough or will feel like there is something wrong with her, and she will stop showing up. Constable last worked at a "Curves for Women" owned by her grandmother. Her job was to sign people up, talk to the women, and do light cleaning. The job ended when she was told she had a herniated disc in her back and the doctor recommended she do something different. Constable also provided childcare in a daycare for about a year and a half, but that job ended when she moved.

In a typical day, Constable testified that she gets up with her daughter around 8:30 or 9:00 a.m., they eat breakfast, play, and read books, and watch TV She testified that she gives her daughter baths, but has difficulty bending down, so she has to take breaks. She testified that she does not watch much TV. She reads, looks at things on eBay, looks at kids' toys on parents.com and reads parenting articles. She testified that her grandparents encourage her to get outside more. During the time she was living independently, she went to the park twice with her daughter over a nine-month period. She attends parenting classes once a week.

Constable talked about the DSF requirements she had to meet in order to get custody of her daughter. These included attending two inpatient treatment centers and a parenting class. In the treatment centers, Constable testified she was required to do her own laundry, do dishes, make her bed, and vacuum or sweep. Constable testified that she cooks very easy meals and occasionally goes shopping with her grandma. She noted that has anxiety worse now than ever.

The ALJ asked Constable how she met her daughter's father. Constable testified that he was the brother of a friend she met in an outpatient treatment center. She went out to dinner with him. He was 52 years old and an alcoholic. Constable testified that she has probably been to one or two movies since that relationship, but she could not name what movies. She testified that she likes card games and would "love, love" to go back to school. She testified that she has told everyone this, including her counselors. She does not have a driver's license and gets around by getting rides from her grandma and close friends. There is no public transportation where she lives.

Constable testified that her mother visits her, as does one close friend. She goes to NA meetings usually once a week, though recently she had been going only once a month. She testified that she generally avoids family and friends' events like weddings, funerals, and graduations.

Constable testified that her daughter was born with an opioid addiction, which they knew was going to happen because Constable took Suboxone during her pregnancy.  She stated that currently she is on Suboxone, Zoloft, a low dose of Klonopin, and BuSpar, but the BuSpar is not really helping.  She testified that with her current meds she has felt pretty good, and she stated that she was also starting to have appointments with a therapist, which she hoped would help her.  She later testified that she still has panic attacks once or twice every other month.

Constable stated that she has lower back pain with pain shooting down her leg sometimes.  She has pain maybe 10 out of 30 days, and lifting aggravates it.  Constable stated that she had had steroid injections in her back, but she could not tell if they actually worked because at the time she was also on pain medication.  She was prescribed physical therapy at some point and had gone for a while but had not been to an appointment in a couple of years, and no one had told her to go.

Constable testified that she had very bad depression right after her daughter was born, but the Zoloft seems to be helping with it now.  She testified that she still gets "the down and out feelings" and "the I'm not good enough."  The last time she had a pseudo seizure from a panic attack was June 2012.  Constable testified that standing does not bother her unless her back is hurting, and that she can lift her daughter, who is 19 pounds, but "that is pushing it."

## *Vocational Expert's Testimony*

Vocational expert Carly Kauflin also testified before the ALJ. She classified Constable's past work as follows: fitness center sales representative – SVP 4, light; childcare attendant – SVP 2, medium; and cashier – SVP 2, light. The ALJ then asked Kauflin to consider a hypothetical individual of the same age, educational level, and job experience as Constable. The individual would be limited to light work except she may frequently climb ramps and stairs, never climb ladders, ropes or scaffolds; may frequently balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to noise, vibration, and hazards such as dangerous machinery and unprotected heights; and is limited to simple, routine, and repetitive work. Kauflin testified that Constable could likely not perform any of her past work, but she could perform work as a general assembler – SVP 2, light; a circuit board assembler – SVP 2, light; or a hand packager – SVP 2, light.

During examination by Constable's attorney, Kauflin testified that it would be work preclusive if the ALJ's hypothetical person were to miss work approximately four times per month. She testified that missing work even two times per month would be work preclusive. She next testified that it would be work preclusive if that hypothetical person were 10% less productive than average, and being 10% less productive than average would preclude all employment in the simple, routine, and repetitive work category.

### III.    Standard for Determining Disability under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity.  If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work. If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, he is declared disabled. 20 C.F.R. § 404.1520; § 416.920.

### *Evaluation of Mental Impairments*

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 416.920a. The procedure requires an ALJ to determine the degree of functional limitation resulting from a mental impairment. The ALJ considers limitation of function in four capacities deemed essential to work. 20 C.F.R. § 416.920a(c). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 416.920a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation with regard to

episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more.  *See* 20 C.F.R. § 416.920a(c)(4).

After rating the degree of functional loss, the ALJ is to determine the severity of the mental impairments with reference to the ratings. 20 C.F.R. § 416.920a(d). If the mental impairment is severe, then the ALJ must determine whether it meets or equals a listed mental disorder.  *Id*.  This is done by comparing the presence of medical conclusions and the rating of functional limitation to the criteria of the appropriate listed mental disorders. *Id.* If the claimant has a severe impairment, but the impairment neither meets nor equals the listing, then the ALJ is to do a residual functional capacity assessment.  *Id*.

**IV.    The ALJ's Decision**

Applying the five-step sequential evaluation, the ALJ first determined that Constable had not engaged in substantial gainful activity since the date she applied for SSI benefits, May 27, 2011.

At step two, the ALJ found that Constable had the following severe combination of impairments: panic disorder with agoraphobia, opioid dependence, depressive disorder not otherwise specified, generalized anxiety disorder, degenerative disc disease, and obesity.

At step three, the ALJ determined that Constable does not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. First, the ALJ opined that Constable's back impairment did not satisfy the listing 1.04 for disorders of the spine. Next, the ALJ found that none of her mental impairments singly or in combination meet or medically equal the criteria of listings 12.04, for affective disorders, or 12.06 for anxiety-related disorders. In making this finding, the ALJ considered whether the "paragraph B" criteria of the listings were satisfied and determined they were not. She found Constable had a mild restriction in activities of daily living; mild difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and no episodes of decompensation of extended duration. The ALJ determined that none of the "paragraph C" criteria of the relevant listings were satisfied.

Next, the ALJ found Constable has the residual functional capacity to perform light work as defined in 20 CFR § 416.967(b). She opined that Constable can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She determined Constable can frequently balance, stoop, kneel, crouch, and crawl, but she must avoid concentrated exposure to noise, vibration, and hazards such as dangerous machinery and unprotected heights. Finally, she opined that Constable is limited to simple, routine, repetitive tasks.

In fashioning the RFC, the ALJ determined that while Constable's impairments could be expected to produce her alleged symptoms, Constable's

statements regarding the alleged intensity, persistence, duration, and impact on functioning of her impairments were not entirely credible.

With regard to Constable's back pain, the ALJ noted that although the medical records showed degenerative disc disease in Constable's spine, she had not presented with medical signs reasonably consistent with her allegations. A December 2010 x-ray showed degenerative changes at the L4-L5 disc space and facet joints of the lumbosacral junction. However "no other significant findings were observable" from the x-ray, and Constable has not experienced any chronic deficits in her motor, sensory, reflex or strength capabilities. Other than using pain medication, Constable had not sought or been recommended for any significant treatment for her back pain during the relevant period, and she testified that the pain is alleviated by walking and applying heat. The ALJ opined that this type of conservative treatment did not support a conclusion of "intractable back pain one-third of the time" as alleged.

The ALJ next determined that Constable's mental impairments have "manifested only mildly abnormal medical signs" that do not support the presence of functional limitations greater than those in the RFC. The ALJ noted that mental status examinations performed during the relevant period showed only "intermittent, mildly abnormal medical findings such as depressed, anxious or tearful affect," and many of her mental status examinations indicated no significant

findings.  The ALJ noted that much of Constable's most severe problems with her mental state were related and limited to losing custody of her daughter in February 2012.  The ALJ further opined that the credibility of Constable's claims regarding her mental impairments was diminished by her treatment history.  Her treatment regimen consisted of the use of medications and therapy, and no extreme measures for treating Constable's "rather extreme allegations, particularly her purported panic attacks" had been recommended to or sought by her.  Constable failed to keep several doctor's appointments and had engaged in drug-seeking behavior.

Next, the ALJ opined that Constable's credibility was diminished by her poor work history and by inconsistencies in the record regarding her drug use and her ability to drive.  Lastly, in discounting Constable's credibility, the ALJ noted that Constable reported engaging in daily and social activities that exceed the extreme limitations she alleged.  For instance, Constable claimed she was able to live independently (cook, clean, shop, care for herself), care for her daughter, attend group therapy and NA meetings, attend parenting classes and church services, and meet a boyfriend and become pregnant while disabled.  She also noted that Constable has friends and a strong family support system.

The ALJ accorded the medical opinions of Dr. Daniel Vinson little weight because they were not consistent with his treatment records or with the record as a whole.  She noted that Vinson's opinion that that Constable possesses marked

restrictions with regard to social functioning was inconsistent with Constable's reports that she engaged in a wide variety of social activities. Vinson's opinion that Constable has a disabling physical impairment was not supported by the medical evidence.

Partial weight was accorded to the opinion of non-examining state agency psychological consultant Steven Akeson. The ALJ noted that Akeson's opinion was consistent with the Constable's "longitudinal medical history and self-reported daily activities." However, she opined that his conclusion that Constable has moderate difficulties in social functioning was "belied by the claimant's testimony and other statements" indicating that she has only mild difficulties in that area.

The ALJ gave partial weight to the various Global Assessment of Functioning scores assigned to the plaintiff throughout the medical record, except that she accorded less weight to GAF scores below 60.

Lastly, the ALJ accorded partial weight to the third party function report completed by Constable's mother because the mother's statements as to the severity of Constable's impairments "merely corroborated" Constable's, which the ALJ found not credible. The mother's observations regarding Constable's daily activities were "fully considered" for purposes of the ALJ's opinion.

At step four, the ALJ found that the demands of Constable's past jobs exceed her RFC and she is unable to perform past relevant work.

Finally, at step five, the ALJ relied on the vocational expert's testimony to conclude that, given Constable's RFC, age, education, and work experience, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy.

## V.    Standard of Review

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2003).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion. *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and

nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon

a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

**VI.   Discussion**

Constable argues that the ALJ erred by (1) improperly assigning treating

physician Dr. Vinson's opinions little weight; (2) improperly relying on the

medical opinion of a state agency non-examining physician; (3) improperly

discounting Constable's credibility; (4) not basing her physical RFC on at least

some medical evidence; (5) failing to include a proper narrative discussion

regarding how the evidence supports her RFC.

*Dr. Vinson's Opinions*

In analyzing medical evidence, "[o]rdinarily, a treating physician's opinion

should be given substantial weight." *Rhodes v. Apfel*, 40 F.Supp.2d 1108, 1119

(E.D.Mo.1999) (quoting *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995)).  A

treating physician's opinion will typically be given controlling weight when the

opinion is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012–1013 (8th Cir.2000) (quoting 20 C.F.R. § 404.1527(c)(2)). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." *Id*. at 1013 (internal citation and quotation marks removed). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" *Id*. (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997)).

Whatever weight the ALJ accords the treating physician's report, the ALJ is required to give good reasons for the particular weight given. *See Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir.2001). The ALJ, however, is not required to discuss every piece of evidence submitted. *See Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir.1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or

support the opinion.  *See Rhodes*, 40 F.Supp.2d at 1119; 20 C.F.R. §

404.1527(c)(2)-(6).

In evaluating Dr. Vinson's opinions, the ALJ first stated, generally, that his

opinions were not consistent with his treatment records or with the record as a

whole.   The ALJ then turned to Dr. Vinson's mental MSS.  She noted that

"although his report possessed a number of marked restrictions with regard to

social functioning, the claimant reported being able to engage in a wide variety of

social activities that are inconsistent with such a conclusion."  For instance, the

ALJ noted that Constable met her boyfriend and became pregnant after her alleged

onset date of disability, and that she has friends, attends church and has a "strong

family support system."  She also noted, with regard to both of Vinson's opinions,

that they were consisted of a "checkbox format that does not provide an

explanation reconciling the discrepancies between the evidence of record and his

Medical Source Statement."  This is the extent of the analysis the ALJ undertook

regarding Vinson's mental MSS before she determined that his opinion should not

only not be given controlling weight, but should be accorded little weight.

As an initial matter, I find that the ALJ's discussion regarding Vinson's

mental MSS fails to show how Vinson's opinions are inconsistent with "substantial

evidence" in the record, such that they should not be accorded controlling weight.

The ALJ noted a few instances in which Constable engaged in a relationship or

group activities, but she failed entirely to discuss or reference any of the extensive objective medical records pertaining to Constable's mental health, Dr. Akeson's medical opinion, or the third party function report completed by Constable's mother — all of which would seem to support Dr. Vinson's opinion. Even if the ALJ did properly show and conclude that Vinson's opinion should not be accorded controlling weight, however, in determining the proper weight to accord it, she still neglected to consider the factors required by 20 C.F.R. § 404.1527(c)(2)-(6). The regulations mandate that an ALJ "always give good reasons…for the weight [accorded a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). The ALJ has failed to do so in this instance.

With regard to Vinson's physical MSS, I find that ALJ's opinion is similarly problematic. She opined that although Vinson reported that Constable had "an unspecified physical impairment that precludes fulltime employment," the objective medical evidence of record, which she had previously discussed, "does not establish the presence of a physical impairment that results in such a profound limitation." As already noted, she then added that the checkbox format of Vinson's opinions provided no explanation reconciling the discrepancies between the evidence of record and his opinions.

As discussed in the ALJ's opinion, there is minimal objective evidence regarding Constable's alleged degenerative back problems, including in Dr. Vinson's own records. The record includes a 2010 x-ray showing degenerative changes at "L4/L5 and facet joints at lumbosacral junction," but no other significant findings were noted at that time. Twice in 2010 and once in 2012 Constable reported back pain to her doctors, but there is no medical evidence that she obtained or was recommended for physical therapy or sought any further treatment for her pain. She did testify that she has received steroid injections in her back, but it seems that primarily her treatment has been to use Suboxone as a painkiller. In visits to Dr. James in January and February 2011, Constable's spine was noted to be normal.

However, in determining the proper weight to accord Vinson's opinion, the ALJ again failed to properly discuss or consider the factors required by 20 C.F.R. § 404.1527(c)(2), and as a result, I conclude that the she failed to give good reasons for the weight accorded to a treating physician's medical opinion. In light of this, this case will be remanded for proper consideration of Dr. Vinson's opinions. At that time, the ALJ shall reconsider the record as a whole, including the medical and nonmedical evidence of record, the medical opinion evidence, and plaintiff's own description of her symptoms and limitations, and reassess plaintiff's RFC. Such reassessed RFC shall be based on some medical evidence in the record and shall be

accompanied by a discussion and description of how the evidence supports each RFC conclusion.

### Dr. Akeson's Opinion

Constable argues that the opinion of psychologist, Dr. Steven Akeson, a state agency non-examining medical source, was improperly accorded "considerable weight" by the ALJ. The ALJ actually accorded Akeson's opinion partial weight, noting that his conclusion that Constable possesses moderate difficulties in social functioning was belied by her testimony and other statements.

Normally, the opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not constitute substantial evidence on the record as a whole. *Shontos v. Barnhart*, 328 F .3d 418, 427 (8th Cir.2003). Although the opinions of nonexamining sources may be considered, they are generally given less weight than those of examining sources. *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir.2010); *see* 20 C.F.R. § 404.1527(c)(1). Furthermore, in evaluating nonexamining source opinions, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." 20 C.F.R. § 404.1527(d)(3); *see also id*. § 404.1527(f) (discussing rules for evaluating nonexamining state agency opinions). In *Wildman*, in determining that the ALJ properly disregarded the state agency psychologists' opinions from 2003 and 2004, the Eighth Circuit found it

"significant that the state agency evaluators did not have access to medical records from 2005 to 2006."  596 F.3d at 967.

Here, it is not entirely clear exactly how Akeson's opinion factored into the ALJ's final RFC determination, or how according it less or no weight would have changed the RFC—especially after the ALJ had already independently discounted Vinson's opinion.  In any case, however, I have already determined that this matter will be remanded for the ALJ to reevaluate all evidence of record and reassess her RFC determination.  On remand the ALJ should reconsider and weigh Akeson's opinion in accordance with law and precedent discussed above.

### *The Credibility Determination*

The ALJ found that although Constable's impairments could reasonably be expected to produce her alleged symptoms, the alleged intensity, persistence, duration, and impact on functioning of her impairments were not entirely credible.

Constable argues that the ALJ's credibility finding was improper for three reasons.  First, she claims the ALJ failed to cite or consider the *Polaski* factors noted below.  Second, she claims the ALJ erred by using Constable's activity level as a basis for discounting her credibility as to the severity of her impairments.  Third, Constable claims the ALJ erred because she "ignored other parts of Constable's testimony that detracted from the activities cited by the ALJ."

Under the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)*,* an ALJ must consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011). The ALJ is not required to explicitly discuss each *Polaski* factor. *Id.* "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir. 2004). Although an ALJ cannot discount a claimant's subjective allegations solely on a lack of objective medical evidence to support them, he may find a lack of credibility based on inconsistencies in the evidence as a whole. *See Ford v. Astrue,* 518 F.3d 979, 982 (8th Cir.2008).

Constable's first argument fails because the ALJ not only cited to the Federal Regulation and Social Security Ruling governing the factors that must be considered in assessing a claimant's credibility, she also explicitly recited the *Polaski* factors. *See* 20 CFR 416.929(c) and SSR 96-7p. After naming the *Polaski* factors, the ALJ went on to discuss them at some length in the context of Constable's case. [Tr. 16-18].

Constable's second argument, that the ALJ erred in using Constable's activity level as a basis for discounting her credibility, also fails. As the defendant has pointed out, one of the factors an ALJ is required to consider in evaluating credibility is the claimant's daily activities. *See* 20 C.F.R. § 416.929(c)(3); SSR 96-7P; *Buckner,* 646 F.3d at 558.

Finally, Constable's third argument, that the ALJ erred by ignoring the parts of Constable's testimony "that detracted from the activities cited by the ALJ," appears to be an argument that the ALJ's credibility determination was not supported by substantial evidence in the record. I will analyze it accordingly.

With regard to her mental impairments, the ALJ indicated that Constable claimed she "lacks motivation due to depression," that her grandmother "has to push her to go to dr's appointments," that she "has days when she won't want to shower and get dressed," and that she experiences panic attacks once or twice every month. In discounting Constable's credibility regarding the severity of her mental impairments,[1] the ALJ first noted that the objective medical evidence showed many of her mental status examinations yielded no significant findings. She further opined that Constable's credibility was diminished by the fact that on several occasions she neglected to comply with her routine treatment regimen by

---

[1] Constable's argument is directed exclusively at the ALJ's credibility determination as to the alleged severity of her mental impairments; therefore, I am not discussing the ALJ's credibility determination as to the severity of Constable's physical impairments.

failing to keep her doctor's appointments. The ALJ noted that the record showed that Constable's treatment regimen for her mental impairments, when followed, had been generally effective. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (failure to follow a recommended course of treatment weighs against a claimant's credibility).

Next, the ALJ opined that Constable reported an ability to engage in daily and social activities that exceeded the extreme functional limitations she claimed she had due to her mental impairments. For instance, Constable reported an ability to perform household tasks associated with independent living, such as taking out the trash, making her bed, vacuuming, sweeping and doing laundry. Constable was also able to care for her daughter independently, and she reported having friends and a strong family support system. Constable claimed she had previously attended group therapy, and that she attended weekly parenting classes and monthly narcotics anonymous meetings. In her function report, Constable indicated that she tries to go to church every Sunday.

ALJ further opined that inconsistencies in the record as a whole diminished Constable's credibility. For instance, Constable testified that she had not used illicit opioids since 2010, but the record documented illicit drug use as recently as

2012.[2]  Additionally, the ALJ determined that Constable's poor work history

detracted from her credibility.  The ALJ noted that Constable had been

unemployed or underemployed since well before her alleged onset date.  *See*

*Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (lack of work history

may indicate a lack of motivation to work rather than a lack of ability); *Woolf v.*

*Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (poor work history can lessen

credibility).

"If an ALJ explicitly discredits the claimant's testimony and gives good

reason for doing so, we will normally defer to the ALJ's credibility determination."

*Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir.2003); *see also Browning v.*

*Sullivan,* 958 F.2d 817, 821 (8th Cir.1992) ("We will not disturb the decision of an

ALJ who seriously considers, but for good reasons explicitly discredits, a

claimant's testimony of disabling pain.").  Here, the ALJ pointed to substantial

evidence in the record supporting her decision to discount Constable's subjective

allegations as to the severity of her mental impairments.  I will therefore defer to

the ALJ's credibility finding.

### The Physical RFC and the Narrative Discussion in Support

---

[2] The ALJ also opined that claimant's testimony that she had been unable to drive since 2006 due
to a driving under the influence charge was inconsistent with records showing that she was
driving until at least December 2010.  I conclude that the records cited by the ALJ do not
demonstrate an inconsistency because Constable only stated that she did not drive at the time she
provided the information.  She did not say she had never driven since losing her license in 2006.

As noted above, Constable also argues that the ALJ erred by not basing her physical RFC determination on at least some medical evidence and by failing to include a proper narrative discussion regarding how the evidence supported her RFC. Because I have already determined that the ALJ must reevaluate the evidence of record and fashion a new RFC, I will not address these arguments at this time. However, as stated above, the ALJ's newly assessed RFC must be based on some medical evidence in the record and must be accompanied by a discussion and description of how the evidence supports each RFC conclusion. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) and SSR 96–8P.

## VII.   <u>Conclusion</u>

For the aforementioned reasons, I conclude that the ALJ failed to properly evaluate the weight to accord the opinions of treating physician Dr. Daniel Vinson, and therefore her decision was not supported by substantial evidence on the record. As a result, I will remand for the ALJ to render a decision consistent with this order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the commissioner is reversed and remanded under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

A separate judgment in accordance with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of September 2015.